# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ronald Yocca, : 
      Appellant : 
          : 
     v. :  No. 846 C.D. 2023
          : 
Turtle Creek Zoning Hearing Board : 
and Borough of Turtle Creek  :  Submitted: September 9, 2024


BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE STACY WALLACE, Judge
     HONORABLE MATTHEW S. WOLF, Judge


OPINION BY JUDGE WOLF        FILED: August 1, 2025


Ronald Yocca (Applicant) appeals the June 27, 2023 order of the Court of Common Pleas of Allegheny County (trial court) denying Applicant's appeal from the decision of the Borough of Turtle Creek (Borough) Zoning Hearing Board (Board) that denied Applicant's request for a special exception and reasonable accommodation. Upon review, we find that the trial court properly affirmed the Board's denial of Applicant's special exception but failed to apply the proper analysis to Applicant's request for reasonable accommodations under the Fair Housing Amendments Act of 1988[1] (FHA). Therefore, we affirm in part and vacate and remand in part.

---

[1] 42 U.S.C. §§ 3601-3631.

# I. BACKGROUND

Applicant owns the property at 828 Maple Avenue in the Borough (Property), which has operated as a sober recovery house since 2018, housing up to seven individuals in drug and alcohol recovery. Original Record (O.R.) at 28-29.[2] The Property is in a R-2 Residential zone district under Borough's zoning ordinances (Ordinances). *Id.* at 28. Under the Ordinances, group homes are permissible in R-2 Residential zones with a special exception, provided they house no more than three individuals. Borough Ordinance 1083 § 812.12, found at O.R. 191. On October 7, 2021, Applicant requested a special exception or reasonable accommodation for his use of the Property as a sober recovery home, following two previous requests[3] for reasonable accommodations pursuant to the FHA which went unanswered or were denied. O.R. at 23-25.

On November 18, 2021, the Board held a hearing on Applicant's request. Applicant testified first, describing the nature of his recovery house at the Property, noting that it serves as a recovery house where individuals leaving more institutional rehabilitation environments can live in shared sobriety with other individuals, rather than returning to dysfunctional homes or neighborhoods. Reproduced Record (R.R.) at 13, 15-16. Applicant further testified as to why he chose a residential district for the house, noting that "[a commercial district is] more institutional. It's not like in a family environment. Lot of these guys never had a solid family lifestyle, you know, they never had a Christmas tree, stuff like that. And we like them to be in a neighborhood where they got neighbors." *Id.* at 17. Applicant also stated that residents are screened during the application process to live at the Property and pay a monthly fee to stay there. *Id.* at 19. He further testified that the

---

[2] Page numbers refer to electronic pagination, as the Original Record is unpaginated.

[3] These requests were made in December 2019 and October 2020.

2

Property houses up to seven individuals in recovery at a time, and those individuals earn additional privileges and freedoms throughout their stay as they maintain sobriety and abide by house rules. *Id.* at 20-21. Applicant also stated that some individuals have stayed at the house for as long as "over three years." *Id.* at 20. Residents are overseen by a house manager, who is a resident who has earned the responsibility to oversee fellow residents at the Property. *Id.* at 23.

The Board inquired as to the sufficiency of the parking on site. R.R. at 21. Applicant testified that the Property is located near a bus stop and many residents do not have vehicles[4] but stated that he believes the Property could accommodate five vehicles parking in the yard. *Id.* at 21-22, 28. The Board also inquired as to the layout of the house, with Applicant testifying that of the seven bedrooms in the house, four are in use, with one bedroom rooming three individuals. *Id.* at 24. The Board also inquired as to the exits in the house, with Applicant responding that there was no exit from the second floor, but two functioning exits from the first floor. *Id.* at 24-25. The Board expressed concern as to the safety of residents on the second floor without a second-floor exit, and Applicant contended that it was no different from other homes in the area. *Id.* Applicant also stated that while he did not believe installing a fire escape is feasible, he was considering alternative options, such as rope ladders. *Id.* at 26.

The Board next allowed testimony by neighbors, who expressed concern as to the condition of the house, noting different exterior upkeep they

---

[4] Applicant stated he believes three residents had vehicles at that time. R.R. at 27. The Board responded that number was subject to change as individuals moved in or out or decided to get vehicles, which Applicant conceded was true, but also noted he takes vehicles into account when choosing which of his recovery homes to place a resident in. *Id.* at 27-28.

thought was necessary, as well as expressing concern regarding residents parking in the yard. *Id.* at 32-34, 38-40.

Next, a former house manager and current house manager testified regarding the impact of living at the Property. Both expressed that the responsibility and shared accountability aided in their recovery. R.R. at 42, 45-48.

The record does not indicate whether the Board issued a decision following the November 18, 2021 hearing, but it conducted a second hearing on July 28, 2022, pursuant to a remand from the trial court. R.R. at 68-69. At the remand hearing, Applicant testified. On direct examination, Applicant testified again regarding the nature of the Property and its occupancy, along with its relationship with Western Pennsylvania Alliance of Recovery Residences (West PARR). *Id.* at 72-77. He also testified as to his history within the drug and alcohol recovery community. *Id.* at 77-80. On cross-examination, the Borough's counsel inquired as to the number of residents that have been housed at the Property since it started operating as a recovery house in August 2018, with applicant testifying that it may have been as many as 40.[5] R.R. at 85. Applicant also testified that he preferred for residents to stay for at least one year and some residents had stayed for over two years. *Id.* On redirect examination, Applicant testified that he needed four residents at the Property in order for it to be financially viable, and with only three residents he would be "just barely paying the bills to keep the house open, and I don't think that's including rent." *Id.* at 87. On re-cross, Applicant was again asked about the

---

[5] At the close of the hearing, over the objection of the Borough's counsel, the Board allowed the record to be kept open for Applicant's counsel to submit a more precise figure based on Applicant's records. R.R. at 118. Applicant's counsel subsequently stated that Applicant's records indicated that 31 individuals had been housed at the Property. *Id.* at 135.

4

parking available at the Property and testified that there were four spaces in the rear lawn. *Id.* at 89.

Another member of the recovery community (and member of West PARR, through which she knew Applicant), Joyce Sed, testified as to her experience as a parole agent and the role of and need for recovery houses in the community. R.R. at 95-99. She stated that the fact that many recovery homes were full spoke for itself that there was a need for such homes. *Id.* at 99.

Another friend of Applicant, police officer Joe O'Donnell, testified as to the positive impact of Applicant and the Property (and similar homes) for the community and individuals recovering from addiction. *Id.* at 100-03.

One of Applicant's neighbors testified, expressing similar concerns regarding the Property's condition to those expressed in the first hearing. *Id.* at 103-06. Another expressed concerns regarding how the presence of a recovery house may impact property values. *Id.* at 112-13.

On January 19, 2023, the Board issued its Order denying Applicant's request for a special exception and reasonable accommodation. In its accompanying Findings of Fact and Conclusions of Law, the Board concluded that the number of residents Applicant requested to house on the Property pursuant to his request for a special exception was more than double the three permitted under the special exception for group homes. O.R. at 30. The Board also concluded that the group home special exception provided an adequate accommodation for Applicant, and therefore he was not entitled to an additional accommodation under the FHA. *Id.* at 30-31.

Following the Board's decision, Applicant appealed to the trial court, arguing that he should have been granted a special exception and, further, that he

5

should have been given a reasonable accommodation under the FHA. In support of the latter argument, Applicant argued that the occupants of the Property should be treated as a family under the zoning ordinance, or otherwise not subject to the occupancy cap for group homes due to application of the FHA. The trial court issued an order affirming the Board's denial of Applicant's requests for a special exception or reasonable accommodation. In its accompanying opinion, the trial court reasoned that the Board properly applied its special exception rule in denying Applicant's request, as the number of occupants residing in the Property was more than double that permitted under the special exception for group homes. The trial court further opined that the Board properly found that Applicant was not entitled to a reasonable accommodation under the FHA, as the residents of the Property did not meet the definition of a "family" under the Ordinances, and the special exception for group homes provided an adequate accommodation for Applicant.

## II. ISSUES ON APPEAL

On appeal,[6] Applicant raises two issues. First, whether he was entitled to a special exception under the Ordinances. Second, whether he should have been granted a reasonable accommodation under the FHA.

We address each issue in turn.

## III. DISCUSSION

*A. Applicant's Request for a Special Exception*

As an initial matter, we discuss whether Applicant was entitled to a special exception under the Ordinances. We forego discussion of the parties'

---

[6] Where, as here, a common pleas court does not take additional evidence, our review is limited to determining whether the Board committed an abuse of discretion or an error of law. *Allegheny W. Civic Council, Inc. v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 689 A.2d 225, 227 (Pa. 1997).

6

arguments with respect to same, as this inquiry is relatively straightforward and the parties, especially Applicant, largely focus their arguments on the FHA issue.

As previously noted by this Court, "it is well settled that a zoning hearing board's interpretation of its own zoning ordinance is entitled to great weight and deference. Such deference is appropriate because a zoning hearing board, as the entity charged with administering a zoning ordinance, possesses knowledge and expertise in interpreting that ordinance." *Kohl v. New Sewickley Twp. Zoning Hearing Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015) (internal quotation marks and citations omitted). It is only when "that interpretation is inconsistent with the plain language of the ordinance, [that] the interpretation carries little or no weight." *City of Clairton v. Zoning Hearing Bd. of City of Clairton*, 246 A.3d 890, 909 (Pa. Cmwlth. 2021) (internal quotation marks and citations omitted).

Here, the Ordinances permit a group home to operate in an R-2 Residential district by special exception, with a group home defined, in relevant part, as "[a] group of *up to three persons* living as a single housekeeping unit living within a unit." Turtle Creek Ordinance 1083 § 812.12. The Board's authority to grant special exceptions is limited to "use[s] set forth or allowed in this Ordinance[.]" *Id.* § 604 (emphasis added).

Here, the Board properly denied Applicant's request for a special exception under its ordinance. The ordinance permits a special exception for a group home in a R-2 Residential district but limits such use to homes with no more than three individuals. The relevant language in the Ordinances is not ambiguous, and the Board's decision is consistent with the plain language of same. Therefore, it properly denied Applicant's request for a special exception for a group home

housing seven individuals, which is not a use "set forth or allowed" in the Ordinances.

B. *Applicant's Request for a Reasonable Accommodation*

Even though the Board properly applied the Ordinances with respect to a special exception, we must address whether Applicant should be granted a reasonable accommodation under the FHA.

Applicant argues[7] that the Board and trial court failed to properly consider the application of the FHA to his request for a reasonable accommodation. In support, he cites *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995), in which the United States Supreme Court held that only those occupancy limits which apply neutrally in a zoning district across different use cases fall under the FHA's absolute exception permitting occupancy limits. Applicant further contends that the Board and trial court failed to follow the applicable framework in considering whether a reasonable accommodation should be granted, citing *Lapid-Laurel, L.L.C. v. Zoning Board of Adjustment of Township of Scotch Plains*, 284 F.3d 442 (3d Cir. 2002), and *Carunchio v. Swarthmore Borough Council*, 237 A.3d 1183 (Pa. Cmwlth. 2020) (en banc).

The Board and Borough's arguments largely mirror the Board's original conclusion that Applicant was already provided an adequate accommodation under the law through the Ordinances' special exception for group homes. They further contend that the occupancy limit for group homes falls under the FHA's absolute exception permitting occupancy limits.

---

[7] We forego outlining the parties' arguments as to whether the residents of the Property meet the definition of a "family" under the Ordinance. We find such arguments to be inapposite, as discussed below.

8

It is undisputed by the parties that addiction is a disability covered by the FHA. Under the FHA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap. . . ." 42 U.S.C. § 3604(f)(2). Discrimination is defined to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

The FHA provides an absolute exception to its application with respect to "restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). In *City of Edmonds*, the United States Supreme Court held that the occupancy restrictions that fell under such exception were those that "apply uniformly to all residents of all dwelling units. Their purpose is to protect health and safety by preventing dwelling overcrowding." 514 U.S. at 733. Accordingly, non-uniform occupancy restrictions do not fall under the FHA exception and may be subject to reasonable accommodation under the FHA.

In *Lapid-Laurel, L.L.C.*, the Third Circuit discussed the legal framework for deciding whether an applicant is entitled to a reasonable accommodation under the FHA. This Court adopted the *Lapid-Laurel* rule in *Carunchio*, 237 A.3d at 1183. Under the *Lapid-Laurel* rule, an applicant requesting a reasonable accommodation under an ordinance must first show that the accommodation is necessary. In order to establish that an accommodation is necessary, an applicant must show that such accommodation is "necessary for the facility's financial viability (and therefore necessary to give the handicapped an equal opportunity to live in a residential neighborhood) or would serve a therapeutic

9

purpose, (and would therefore be necessary to ameliorate an effect of the handicap)." *Lapid-Laurel*, 284 F.3d at 461.

Where an applicant shows that the requested accommodation is necessary, the burden shifts to the municipality to show that the accommodation is unreasonable. In order to "establish that the accommodation proffered by the applicant was not reasonable, the municipality is required to prove that it could not have granted the variance without: (1) imposing undue financial and administrative burdens; (2) imposing an undue hardship upon the Township; or (3) requiring a fundamental alteration in the nature of the zoning program. We cautioned that this inquiry is highly fact-specific, requiring a case-by-case determination." *Lapid-Laurel*, 284 F.3d at 462 (internal citations, brackets, and quotation marks omitted). Where an applicant has shown that an accommodation is necessary, it may only be denied if it is unreasonable. *Id.* at 457.

Here, both the Board and the trial court failed to consider the implication of *City of Edmonds* in the instant case. Both the Board and the trial court found that the allowance of group homes for no more than three individuals was a sufficient accommodation for Applicant. However, as noted above, the Supreme Court held in *City of Edmonds* that the FHA exception allowing maximum occupancy limits applied only to those based on space and neutrally applicable to all residents of a zoning district. Here, the three-person limitation for a group home is not based on square footage, but rather usage type, and is not applied neutrally to all residences in the district in that it does not apply to families; therefore, it does not fall under the FHA's absolute exception for maximum occupancy limits. Further, the reliance on the definition of "family" as used in the zoning ordinance, as well as discussion of the applicability of *Albert v. Zoning Hearing Board of North Abington*

10

*Township*, 854 A.2d 401 (Pa. 2004), misconstrues the FHA issue.[8] Accommodations under the FHA need not fit neatly into predefined zoning definitions—rather the inquiry is whether the zoning ordinance should not be enforced as written in order to accommodate disabled individuals.

Therefore, rather than concluding that there was an adequate accommodation available to Applicant under the zoning ordinance, the Board and trial court should have considered the accommodation inquiry as contemplated by *Lapid-Laurel*. There was no fact-finding at either the Board or trial court level as to whether Applicant had shown that his request for a reasonable accommodation was necessary either as it relates to financial viability or an ameliorative benefit for the Property's occupants. Failure to follow the applicable legal test amounts to an error of law.

While no findings of fact focus on this operative question, Applicant did proffer relevant testimony. Applicant testified that the financial viability of the home relied on housing at least four individuals at the Property. Current and former residents also offered testimony as to the benefit of living with other individuals in recovery in maintaining their sobriety and keeping one another accountable. While it is not clear that the ameliorative benefit ties directly to an increase in occupancy, this, along with the question of financial viability, should have been considered as a

---

[8] Rather than consider whether it is reasonable to consider the residents at Applicant's house a "family" under the law, the Board and trial court should have instead considered whether the group home occupancy limitation should not have been enforced as to the Property as a reasonable accommodation to Applicant. Here, unlike in *Albert*, the definition of "family" is not inclusive of a "single housekeeping unit" unrelated by blood or marriage, but rather clearly exclusive of a group home where individual residents are unrelated. In fact, the definition of group home includes "[a] group of up to three persons living as a single housekeeping unit[.]" Therefore, the definitional ambiguity at issue in *Albert* is not present in the instant case.

11

factual matter by the trial court or Board in determining whether Applicant showed that his requested accommodation was necessary.

To the extent that the Board determines, as a factual matter, that Applicant has demonstrated necessity to his requested accommodation (or for some lesser accommodation, such as for a number of occupants greater than three but less than seven), the Board should next determine if the Borough has shown that such accommodation is unreasonable. The Board shall issue a new decision including findings of fact and conclusions of law relevant to the inquiry as outlined above.

## IV. CONCLUSION

Based on the foregoing, we affirm the trial court in part, as to the finding that the Board properly denied Applicant's special exception, and vacate in part, as to the trial court's determination that Applicant was properly denied his request for a reasonable accommodation under the FHA. We remand with the instruction that the trial court remand to the Board to issue a new decision in accordance with this opinion. On remand, the Board is limited to the record as it is presently constituted.

_____
MATTHEW S. WOLF, Judge

12

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ronald Yocca,                 :
         Appellant      :
                     :
      v.               :    No. 846 C.D. 2023
                     :
Turtle Creek Zoning Hearing Board    :
and Borough of Turtle Creek         :

## O R D E R

AND NOW, this 1st day of August 2025, the June 27, 2023 order of the Court of Common Pleas of Allegheny County in the above-captioned case is affirmed in part and vacated and remanded for issuance of a new decision consistent with the accompanying opinion.

Jurisdiction relinquished.

_____
MATTHEW S. WOLF, Judge